### In re PITTSBURG DICK CREEK MINING CO. OF ALASKA.

(District Court, S. D. New York. May 13, 1912.)

BANKRUPTCY (§ 264*)—CORPORATE ASSETS—SALE.

Where a corporation owning certain mining property in Alaska was declared a bankrupt in New York, and, it being impossible for lack of funds to appraise the corporation's property on the ground, its secretary and treasurer testified from reports that it was worth only a nominal sum, whereupon the appraisers fixed the value at $1,000, when it was sold to a reorganizing committee for $1,100, after which new rights were created, a confirmation of the sale would not be denied at the instance of an Alaska creditor, on the ground that there had been a conspiracy to defraud him, since, if he had been the victim of a conspiracy, he had a remedy at law for damages.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 368, 369; Dec. Dig. § 264.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In the matter of the bankruptcy proceedings of the Pittsburg Dick Creek Mining Company of Alaska. On objections to master's report recommending confirmation of a sale of the assets of the bankrupt. Objections overruled, and sale confirmed.

Adolph and Henry Bloch, Charles E. Travis, and Samuel Fruchthandler, all of New York City, for objecting creditor.

William O. Gantz and Madison Grant, both of New York City, for bankrupt.

MAYER, District Judge. Attention is called to some inaccuracies in the report of the special master, but his outline of the situation is substantially correct, and his conclusion is sound.

While the 630 pages of testimony and the exhibits present a mass of detail, the situation under consideration is not difficult of solution. The bankrupt company was engaged in a mining enterprise in Alaska. It was overwhelmingly in debt and confronted with problems and obstacles. On or about April 25, 1911, the company was duly adjudicated a bankrupt, and, in due routine, the referee made his order appointing three appraisers. There were no funds with which to appraise the property on the ground, and, after seeking the court's instructions, it was decided to call one of the officers of the company. This officer was the secretary and treasurer, who had never been in Alaska, and whose information, as is usual, was based on reports from the field and on the up-to-then disastrous experience. He expressed the opinion, in effect, that the property was worth only a nominal sum, and the appraisers fixed the value at $1,000. Prior to this, Nessler (this officer) had been engaged in organizing a syndicate among former bondholders, stockholders, and creditors of the bankrupt to buy the property and do the assessment work and at the time of the sale he had sufficient promises, in addition to cash collected, to warrant him in going ahead.

The property was then worth what some speculator would be willing to pay for it, or what the men who had already lost money were willing to risk, having in mind that further funds would be needed to carry the venture along. The sale was duly advertised, and Nessler, for himself and associates, bid $750, while a dummy for one David Cohn (now deceased) bid $1,100. The Inspiration Gold Mining Company (Nessler and associates) paid Cohn's dummy $500 profit, and acquired the property. I suppose there are plenty of shrewd men looking for bargains, and that, if at that time the property had been worth more, it would have brought more. Precious metal may be in the mines, but its value depends on the ability to work it as a commercial product. That means good title to the claims, efficient machinery, water power, transportation arrangements, and enough capital to stand the strain of the expenses until profits appear. There was nothing wrong in Nessler organizing a syndicate. On the contrary, that was the natural thing to do, if he could. The only hope for recoupment of those who had lost money was to try again, and the situation was urgent because the open season in Alaska is at most

three months, and some $1,700 was needed for representation work. It is earnestly contended that Cohn's dummy was, in fact, the dummy of Nessler and his associates, but the evidence falls short of sustaining this contention.

The attacking creditor Revelas is a mining engineer, and was the supervising manager of the bankrupt's property at the time of the adjudication and for several years prior thereto. He claims that the bankrupt owes him $8,601.85. He was on the ground and knew that the company was in a bad way. (Letters of October 1, 1910; October 14, 1910; October 30, 1910; December 24, 1910; March 29, 1911.) How much would he have bid at the sale? He insists that Nessler and the rest were in a conspiracy to defraud him, and he points to Nessler's telegram of April 16, 1911. In that telegram Nessler distinctly stated that the receiver was without funds, that great efforts would be made to reorganize, and that, in such event, Nessler would make "every effort to protect" his interest. Nessler, in the same telegram, urged Revelas not to leave under any circumstances, and to be patient. Revelas construes this as evidence of a scheme to keep him away from New York, the scene of the bankruptcy proceedings, but I regard this as a natural course under the circumstances. Obviously Nessler and his associates wanted the one man familiar with conditions to stay at the property, while efforts were being made to save something from the wreck. The receiver communicated with Revelas, asking how much money would be required to retain his services. He was advised by Revelas that he required practically immediately a sum which the receiver could not possibly pay, and thereupon Revelas left Nome, went to Dick Creek, but had no further dealings with the receiver or the officers of the bankrupt. In the fall of 1911 Revelas came to New York, and it is claimed that Nessler, who now was secretary and treasurer of the Inspiration Gold Mining Company, offered Revelas an opportunity to invest $500, the same as the principal stockholders had done, that being the largest sum accepted from anybody, and extended this opening to come in with the rest, but Revelas refused so to do. If this is so, then Nessler carried out the promise of his telegram of April 16, 1911, to look out for Revelas in the reorganization. Revelas, however, was not satisfied and later began this proceeding. Meanwhile new rights have sprung up, new money has been ventured, and the project looks more hopeful. To order a resale now will create endless confusion, and may deprive those who have engaged in the enterprise of the legitimate fruits of their investment.

On the other hand, if Revelas has been injured, he has been damaged only to the extent of his claim of some $8,600. If he is the victim of a conspiracy, the courts are open to him, and, in an action at law or in equity (as he may be advised), he may unmask the scheme of which he complains, if such existed, and obtain his just due. In such an action all the parties in interest will have their day in court, which, in this proceeding, they have not. Many details of the testimony and referred to by the special master, though considered, are not here discussed, but in the final analysis the true test is not what

the situation is now, but what it was on June 25, 1911, when the order of sale was made. With the property embarrassed by vexatious complications, heavily in debt and requiring new capital, where was the creditor or outside investor willing to risk much on a bankrupt mining venture in far-off Alaska?

The motion is denied, and the report of the special master is confirmed. Submit order on two days' notice.